UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMARILIS COLLADO,                                    :
as Administratrix of the Estate of
Her Husband JOHN COLLADO, SR.,                       :


                          Plaintiff,                 :        **OPINION**


                - against -                          :        11 Civ. 9041 (DC)


THE CITY OF NEW YORK, New York City                  :
Police Department ("NYPD") Detective
JAMES CONNOLLY, Shield # 4294,                       :


                          Defendants.                :


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**APPEARANCES:**   EMERY CELLI BRINCKERHOFF & ABADY LLP
                   Attorneys for Plaintiff
                          By:    Earl S. Ward, Esq.
                                 Samuel Shapiro, Esq.
                   600 Fifth Avenue, 10th Floor
                   New York, NY 10020

                   ZACHARY W. CARTER, Esq.
                   Corporation Counsel of the City of New York
                   Attorney for Defendants
                          By:    Brian Francolla, Esq.
                                 Melanie Speight, Esq.
                   100 Church Street
                   New York, NY 10007

**CHIN, Circuit Judge:**

On September 6, 2011, defendant James Connolly, a New York City Police

Department ("NYPD") detective, was part of a field team engaged in narcotics

enforcement operations in the Inwood area of Manhattan. Connolly was conducting "observations," in plain clothes, on Post Avenue. He saw suspicious activity and concluded that drugs were being sold at 26 Post Avenue. He entered the lobby of the building and observed two men in an apparent drug transaction. Connolly identified himself as a police officer and began to arrest the man he believed to be the seller. The man, however, lunged at Connolly, knocking him to the ground, and tried to run out to the street. Connolly grabbed him, but the man managed to drag Connolly through the lobby doors and out of the building. Outside on Post Avenue, Connolly and the man continued to struggle as the man tried to escape.

John Collado, Sr. ("Collado"), who lived nearby, saw the altercation from up the block. He ran to intervene. He inserted himself into the altercation by grabbing Connolly. At that point, Connolly pulled his firearm and fired one shot into Collado's stomach. Collado died several hours later.

Collado's widow, Amarilis Collado ("Mrs. Collado"), brought this action pursuant to 42 U.S.C. § 1983 and New York State law, contending, *inter alia*, that Connolly violated Collado's civil rights by using excessive force. On November 1, 2018, at the conclusion of the second trial in this case (the first trial had ended in a mistrial), the jury found in favor of Mrs. Collado and against Connolly, awarding compensatory and punitive damages totaling $14,325,000.

Before the Court are Connolly's motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, for a new trial pursuant to Fed. R. Civ. P. 59, and for remittitur. For the reasons set forth below, the motions are granted in part and denied in part.

## STATEMENT OF THE CASE

### A.     The Facts[1]

On September 6, 2011, Connolly was conducting "observations" as a member of an NYPD field team assigned to the Inwood area of Manhattan. (Second Trial Tr. at 169-70).[2] He was in plain clothes -- a green rain jacket and jeans -- and was carrying a gun and pepper spray as well as handcuffs, a radio, and a cell phone; his gun and badge were underneath his jacket and could not be seen. (*Id.* at 162, 170-71, 182). Four other officers were part of the team, in three different cars. (*Id.* at 29-32, 162, 170, 294-95, 297).

At approximately 5:00 pm, Connolly proceeded on foot northbound on Post Avenue, looking for drug activity. (*Id.* at 31-32, 170-71, 176-77). Neither he nor his

---

[1]     As Mrs. Collado prevailed at trial and is the party opposing judgment as a matter of law, the evidence is construed in her favor and she is entitled to the benefit of all reasonable inferences for purposes of that motion. *Caceres v. Port Auth. of New York & New Jersey*, 631 F.3d 620, 622 (2d Cir. 2011); *Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005). The Court notes, however, with respect to the motion for a new trial, that it "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

[2]     Connolly joined the NYPD in July 2006, after serving four years of active duty in the U.S. Marine Corps. (*Id.* at 168). In September 2011, he was assigned to Manhattan North narcotics division. (*Id.* at 169). At the time of trial, he was a sergeant assigned to the FBI's joint major theft task force and was married with two daughters. (*Id.* at 168-69).

partner (Detective James White) informed other team members that Connolly was walking up Post Avenue alone. (*Id.* at 32-33, 295, 303-04). While on Post Avenue, Connolly saw what he believed to be drug activity, and he entered 17-23 Post Avenue to get a better vantage point. (*Id.* at 174-77). In the lobby, he spoke briefly with Steven Polanco. (*Id.* at 179, 181). Based on the conversation, Connolly concluded that Polanco "was going across the street to buy drugs." (*Id.* at 180). Without radioing anyone from his team, Connolly exited the building, stepped aside, and waited as Polanco left the building and proceeded across the street. (*Id.* at 33-34, 180-82, 295, 303). Polanco entered 26 Post Avenue. (*Id.* at 182-84).

Connolly hurried across the street and was able to catch the door to 26 Post Avenue before it shut. (*Id.* at 183-85). In the lobby, he saw Polanco handing money to an individual later identified as Rangel Batista. (*Id.* at 185). Batista was holding "a large clear bag with a bunch of small zips of marijuana inside" along with money. (*Id.* at 185-87; *see* DX E).[3] Connolly displayed his police shield, verbally identified himself as a police officer, and warned the two men not to move. (*Id.* at 187). As Connolly was about to handcuff Batista, Batista lunged toward Connolly, slamming him against the wall. (*Id.* at 187-88). Connolly fell to the ground, and Batista ran to get out of the building. (*Id.*). Connolly got to his feet, gave chase, and managed to grab

---

[3]     References to "PX" and "DX," respectively, are to plaintiff's exhibits and defendant's exhibits received at trial.

Batista just as Batista reached the first of two doors. (*Id.*). Batista proceeded to drag

Connolly out, through two doors and onto the street. (*Id.* at 188-89).

Outside on Post Avenue, Connolly and Batista continued to struggle. (*Id.*

at 189-90). As Connolly held on, Batista dragged him across to the east side of Post

Avenue, trying to escape. (*Id.* at 136-37, 189-90, 334-35). Out on the street, Connolly

shouted "police," although he did not do so repeatedly. (*Id.* at 451; Doc. No. 140).

Bartolo Diaz was heading up the block when he saw his "friend" Collado walking

toward him. (Second Trial Tr. at 88-89). As they exchanged pleasantries, a woman

passing by said to them "[t]hose two are going to kill each other." (*Id.* at 89). Several

witnesses described Connolly and Batista as "fighting" (*id.* at 90 (Diaz)), "struggling with

each other, one trying to get off, one trying to grab the other" (*id.* at 309 (Perez)), and

"[f]orcing against each other" (*id.* at 327-28 (Peralta Lopez)). Batista "was pushing

[Connolly] in order to escape," "shoving him, trying to push him away." (*Id.* at 335

(Peralta Lopez)).

Referring to Batista as "Carlota" and to Connolly as "the light-skinned

man," Diaz testified that the two were on the ground, "scuffling" and "holding each

other's hands," with Carlota "on top of the light-skinned man." (*Id.* at 91; *see also id.* at

100-01).[4] He heard the light-skinned man -- "the one on the bottom" -- saying "'Please,

please, please.'" (*Id.* at 91; *accord id.* at 101 ("I heard [the light-skinned man] begging,

---

[4]      The parties stipulated that "Carlota" was Batista. (Second Trial Tr. at 309-10).

'Please, please, please.'")). Both men were tired, "beat." (*See id.* at 315-16; *see also id.* at 189-90). The two had been struggling for approximately a minute and a half. (*See* PX 44B (clock readings).

At that point, Collado interceded, as he tried to separate the two; he reached down, grabbed Connolly by the arm and shoulder, and "yanked him out." (*Id.* at 92; *see also id.* at 317 (Perez testifying that Collado grabbed Connolly from behind, pulling him back by the shoulders), 331 (Peralta Lopez testifying that Collado "grabbed hold of the policeman, as to separate him from [Batista]," "like around his neck").[5] Collado let go of Connolly, and Batista tried to run. (*Id.* at 92, 311). But Connolly grabbed hold of him again, and the two were struggling again, standing. (*Id.* at 92-93). Collado got in between them to try to separate them, with his arms open and both hands out, on the other two men's chests. (*Id.* at 93-95). Collado was saying "Stop, stop, stop." (*Id.* at 94). A shot was fired. (*Id.* at 94, 311-312). Connolly had pulled his weapon and, without saying anything, shot Collado in the stomach. (*Id.* at 93-95, 115, 322; *see also* PX 5).

Connolly and Collado were close to each other when the shot was fired, facing each other, touching each other. (*Id.* at 93, 115-16, 311-12, 332-33). One witness described them as "wrestling." (*Id.* at 311). Despite Connolly's testimony to the

---

[5]     Diaz testified that as Collado was yanking Connolly out, "Carlota punched [Connolly] in the face." (*Id.* at 92; *see also id.* at 108-09). The jury, however, found that Batista did not punch (or push) Connolly after Collado intervened. (*Id.* at 451; Doc. No. 140).

contrary, Collado did not at any time put Connolly in a headlock or choke him or slam him into a car. (*Id.* at 100, 312, 320, 335, 337, 339, 451; Doc. No. 140).[6] One witness (Peralta Lopez), however, saw Batista pushing Connolly as Connolly was against a car. (*Id.* at 335). She also testified that Collado had his arm around Connolly's neck, and that he "grabbed hold from the neck," although she clarified that it was "very brief," "no more than three seconds." (Second Trial Tr. at 337-38, 341).[7]

After he was shot, Collado held his hip, on the right side, and then stumbled, falling to the ground. (*Id.* at 95). As he lay on the street, he remained conscious, "moaning" in pain. (*Id.* at 57). After White arrived on the scene, Collado told White that he had been shot. (*Id.* at 57). White saw that Collado was bleeding, but handcuffed him anyway. (*Id.* at 57-58). An ambulance eventually took Collado to a hospital; he was "screaming in pain" while in the ambulance. (*Id.* at 128-29; PX 14). He was conscious for 50 minutes before he was given anesthesia at the hospital for surgery. (Second Trial Tr. at 234). The bullet had traveled through "many loops of bowels, small intestine, large intestine, many blood vessels in the abdomen, and many nerves in the

---

[6]     Connolly testified that Collado came from behind and placed him in a choke hold, while Batista was punching him. (*Id.* at 191-94). He specified that Collado's arm was "under my chin, like, up against my neck, all the way wrapped around tight, squeezing." (*Id.* at 192). He testified that he thought "they were going to kill me at that point." (*Id.* at 194). The jury did not accept this testimony. (*Id.* at 451; Doc. No. 140).

[7]     Connolly is approximately 5'5" and of slight build. (*Id.* at 318). Both Collado and Batista were substantially bigger than him. (*Id.* at 189, 244, 317-18, 328). Collado was 5'9" and about 240 pounds." (Second Trial Tr. at 244). Peralta Lopez testified that Batista seemed "taller" and "stronger" than Connolly. (*Id.* at 328).

abdomen." (*Id.*). He had no more pain after he was administered anesthesia. (*Id.* at

235). He died a few hours later; the cause of death was a gunshot wound to the

abdomen. (*Id.*; PX 5).

On September 6, 2011, Collado was 43 years old (PX 7, 24) and lived at 17

Post Avenue with his wife (Mrs. Collado), their two-year-old son (John J.), and his

mother, who suffered from Alzheimer's. (Second Trial Tr. at 124, 126). Collado had five

other children: Jenny, John, Jr., Amy, Kariel, and John II.[8] (*Id.* at 123). He was home, on

disability, and was not working. (*Id.*). He had gone out to buy some groceries when he

ran into Diaz and then intervened in the fight. (*Id.* at 89-90, 128).

**B.    Prior Proceedings**

Mrs. Collado commenced this action against Connolly on December 12,

2011. (Doc. No. 1). By amended complaint filed November 5, 2012, Mrs. Collado added

the NYPD and the City of New York (the "City") as defendants. (Doc. No. 17). By

second amended complaint filed April 12, 2013, Mrs. Collado also added claims against

the other members of the tactical team. (Doc. No. 25). The claims against the individual

defendants other than Connolly, White, and Sergeant Ronald Smith were voluntarily

dismissed on November 10, 2015. (Doc. No. 60). Defendants thereafter moved for

summary judgment as to certain of the claims, and, by memorandum and order entered

June 16, 2016, the Court (Batts, *J.*) granted the motions and dismissed the claims against

---

[8]    As of October 30, 2018, Jenny, John, Jr., Amy, Kariel, and John II were, respectively, 32, 29, 22, 21, and 20 years old; John J. was 10 years old. (*Id.*).

White and Smith and certain of the claims against the City. (Doc. No. 70). Defendants did not move for summary judgment with respect to the excessive force claim against Collado or the *respondeat superior* claims against the City.

By memorandum and order entered September 27, 2017, Judge Batts ruled on the parties' motions *in limine.* (Doc. No. 97). On May 14, 2018, the case was reassigned to the undersigned. I conferenced the case on May 30, 2018. (Doc. No. 106). The City confirmed that Connolly was acting within the scope of his employment as an NYPD detective during the incident, and that, under the doctrine of *respondeat superior,* if the jury were to find Connolly liable on the excessive force claim, the City would be "automatically liable as a matter of law." (5/30/2018 Tr. at 3-4; Doc. No. 106). In a memorandum decision entered July 20, 2018, I ruled that the City would be removed from the caption as a defendant for trial and that it could not be referred to as a defendant at trial. (Doc. No. 108).

As a consequence of the pretrial rulings and stipulations, only one claim remained to be tried: Mrs. Collado's claim that Connolly violated Collado's civil rights by using excessive force against him.

Trial commenced on July 30, 2018. The jury was unable to reach a unanimous verdict, and on August 7, 2018, I declared a mistrial. (First Trial Tr. at 716-59).

The retrial commenced before a new jury on October 29, 2018. On November 1, 2018, the jury returned a unanimous verdict, finding by a preponderance of the evidence that Connolly "used excessive force against John Collado." (Doc. No. 139; Second Trial Tr. at 435). The jury awarded damages as follows:

- Collado's pain and suffering: $300,000;

- Collado's loss of enjoyment of life: $2.5 million;

- compensatory damages for monetary losses sustained by his family: $1.5 million;

- funeral and burial expenses: $25,000; and

- punitive damages: $10 million.

(Second Trial Tr. at 435-37; Doc. No. 139). The total award was thus $14,325,000.

After the verdict was taken, the parties were given an opportunity to address the jury again, and the jury was asked to answer special interrogatories. (Second Trial Tr. at 438-45, 450-53).[9] The jury answered the special interrogatories as follows:

1.  Did John Collado choke Det. Connolly?
    Answer: No.

2.  Was Mr. Collado choking Det. Connolly when the shot was fired?
    Answer: No.

3A. Did Det. Connolly shout "police" out on the street?

---

[9]  Connolly requested the use of special interrogatories. (First Trial Tr. at 595-96). Over Mrs. Collado's repeated objections, I ordered that they be used. (*See id.* at 597, 609-16, 705-10, 720-24, 726-28).

Answer: Yes.

3B. If yes, did Det. Connolly do so repeatedly?
Answer: No.

4. Did Mr. Batista punch or push Det. Connolly after Mr. Collado intervened?
Answer: No.

(Second Trial Tr. at 451; Doc. No. 140).

There remained the question of qualified immunity. The parties had agreed that this was an issue for the Court and not for the jury. (First Trial Tr. at 598-601). These post-trial motions followed.

## DISCUSSION

Connolly argues that (1) he is entitled to judgment as a matter of law based on the qualified immunity defense; (2) the jury's damages award must be set aside or remitted; and (3) he is entitled to a new trial. I address each argument in turn.

## A. Qualified Immunity

### 1. Applicable Law

"As a general matter, police officers who violate a plaintiff's constitutional rights are nevertheless entitled to qualified immunity if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) (internal quotation marks and citations omitted), or "it was objectively reasonable for them to believe their acts did not violate those rights," *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir.

2004) (quoting *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994)). The standard is an objective one, "asking not whether the defendant officer acted in good faith or what he himself knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). The qualified immunity doctrine recognizes that "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).[10] If an officer's mistake as to what the law requires is reasonable, the officer is entitled to qualified immunity. *Id.*

Whether a right was clearly established is a question of law, and whether a defendant's conduct was objectively reasonable, that is, whether a reasonable officer would have reasonably believed that his conduct did not violate a clearly established right, is a mixed question of law and fact. *Kerman*, 374 F.3d at 108-09. Where the material facts are in dispute, "the factual questions must be resolved by the factfinder," *id.* at 109; *see also Outlaw*, 884 F.3d at 367-68 ("The jury may be asked to make its findings by answering special interrogatories."), and only after the factfinder has determined the facts may the court then "make the ultimate legal determination of whether qualified immunity attaches *on those facts*," *Outlaw*, 884 F.3d at 367 (quotation marks and citations

---

[10]     In *Pearson v. Callahan*, the Supreme Court held that the two-step procedure set forth in *Saucier* for courts to resolve qualified immunity claims -- courts are to first determine whether plaintiff has alleged a violation of a constitutional right, and second, if so, they are to then determine whether the right at issue was clearly established -- "should not be regarded as an inflexible requirement." 555 U.S. 223, 227 (2009). In other words, the courts may take the two inquiries in either order.

omitted).[11] The use of special interrogatories "may not only help focus the jury's attention on the excessive force aspect of the inquiry, but also may help the court resolve the ultimate question of whether it would be clear to a reasonable officer in [the officer's] position that his conduct was unlawful in the situation he confronted." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764-65 (2d Cir. 2003).[12]

Qualified immunity is an affirmative defense as to which the defendant bears the burden of proof. *Outlaw*, 884 F.3d at 367.

## 2. **Application**

Here, the constitutional rights in question were well established: the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards

---

[11] The Second Circuit has observed that there is a "doctrinal tension" in applying qualified immunity to excessive force claims, as the underlying standard -- objective reasonableness -- is the same for both inquiries. *See Finnegan v. Fountain*, 915 F.2d 817, 824 n.11 (2d Cir. 1990); *see also O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ("In Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits." (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994))). A fair argument can be made that I should not even reach the question of qualified immunity, on the theory that the qualified immunity defense is precluded by the jury's finding of excessive force. In *Stephenson*, the Second Circuit noted that the Supreme Court had "clarified" in *Saucier* that "claims that an officer made a reasonable mistake of fact that justified the use of force go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity." 332 F.3d at 78-79 (citing *Saucier*, 533 U.S. at 205). Indeed, the Supreme Court observed in *Saucier* that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." 533 U.S. at 205. In any event, I reach the merits of the qualified immunity defense, and, for the reasons set forth below, I reject it.

[12] *Cowan* was an excessive force case where a police officer shot and killed the driver of a car coming at him. The Second Circuit noted that special interrogatories were advisable in that case, because "[a]nswers to questions such as whether [the driver] drove her car towards [the officer], whether [the officer] was in the zone of danger, and if so, whether he safely could have gotten out of the way," would assist the jury on the excessive force question and the court on the qualified immunity inquiry. 352 F.3d at 764-65.

of reasonableness," *Stephenson*, 332 F.3d at 77 (quoting *Saucier*, 533 U.S. at 201-02), and the use of "deadly force is objectively reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others,'" *Cowan*, 352 F.3d at 762 (quoting *O'Bert*, 331 F.3d at 36). The Supreme Court has instructed that courts are "not to define clearly established law at a high level of generality," *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)), but to focus this inquiry on "the specific context of the case," *id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). In a case similar to this one, the Second Circuit identified the inquiry as whether an officer's use of "deadly force in self-defense" was objectively reasonable, which would turn on whether there was an "immediate threat to the safety of the officer or others." *Salim v. Proulx*, 93 F.3d 86, 91-92 (2d Cir. 1996).

Hence, the question presented was whether it was objectively reasonable for a police officer in Connolly's position to believe that Collado posed an immediate and significant threat of death or serious injury to him or others, such as to justify the use of deadly force in self-defense. This question was put to the jury, as the jury was instructed as follows:

> To determine whether defendant used excessive force, you must determine whether defendant's use of force against Mr. Collado was reasonable, that is, whether a reasonable officer would have employed the same degree of force in addressing the situation, taking into account the totality of the circumstances known to the officer on the scene at the

time. The use of deadly force is unreasonable unless the officer reasonably believes that the individual in question poses an immediate and significant threat of death or serious physical injury to the officer or others.

(Second Trial Tr. at 421-22). Moreover, the jury was provided with instructions on the factors relevant to its determination of the reasonableness of the use of deadly force, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).[13]

---

[13]     The jury was instructed:

> In making this determination, you may consider such factors as the severity of the situation; whether Mr. Collado posed an immediate and significant threat to the safety of defendant or others; whether Mr. Collado was using force, and if so, the degree of that force; and whether the defendant had nonlethal options reasonably available to him.

> On the other hand, an officer faced with an imminent threat of death or serious injury has no duty to attempt to use nonlethal force or to retreat, for he need only act within that range of conduct identified as reasonable. If you find that the amount of force used was greater than a reasonable officer would have employed, plaintiff will have established the claim of loss of a federal right.

> You must judge defendant's actions from the perspective of the reasonable police officer in light of the facts and circumstances confronting him on the scene when force was employed, not based on the 20/20 vision of hindsight. Keep in mind also that police officers must often make split-second decisions in tense and uncertain situations. The reasonableness inquiry is an objective one; that is, you must decide whether

The jury answered the question by finding that Connolly used excessive force. Inherent in its verdict are the further findings that (1) a reasonable officer in the circumstances would not have employed deadly force in self-defense, and (2) a reasonable police officer would not have believed Collado posed an immediate and significant threat of death or serious physical injury to the officer or others. In addition, the entire thrust of Connolly's argument at trial was that he was being choked by Collado to the point where he was in fear of his life; the jury squarely rejected that contention, finding explicitly, in its answers to the special interrogatories, that (3) Collado did not choke Connolly, and (4) Batista did not punch or push Connolly after Collado intervened, and finding implicitly that (5) Connolly was not in fear of his life. And the jury further found, at least implicitly, that (6) Connolly shot Collado without giving any warning. *See Stephenson*, 332 F.3d at 81 (noting that whether police officer "gave warnings" was relevant to resolution of qualified immunity defense); *see also Hemphill v. Schott*, 141 F.3d 412, 417 (2d Cir. 1998) ("potentially deadly force may only be used [by police officers in preventing evasion of arrest] 'if *necessary* to prevent escape, and if, where feasible, some warning has been given'").

---

defendant's use of force against Mr. Collado was objectively reasonable, without regard to defendant's subjective intent or motivation.

(Second Trial Tr. at 422-23).

These findings were supported by the evidence -- the testimony of the eyewitnesses, the videos of the scene, and the medical evidence. To the extent Connolly testified to the contrary, the jury simply did not believe him. Rather, the jury found that Connolly shot and killed, without reasonable justification, someone who was trying to intervene to break up a fight. In these circumstances, and in light of the jury's findings, Connolly is not protected by qualified immunity.[14]

**B.    Damages**

    **1.    Pain and Suffering**

Connolly does not contest the jury's damages award of $300,000 for Collado's pain and suffering. Def. Mem. at 30. In light of the evidence that Collado was conscious for 50 minutes, "moaning" and "screaming in pain" as he lay on the sidewalk and in the ambulance, (Second Trial Tr. at 57; PX 14), and given the extent and seriousness of his injuries, I agree that the jury's award of $300,000 for Collado's conscious pain and suffering is reasonable.

---

[14]    Connolly relies heavily on *Salim v. Proulx*. (Def. Mem. at 21-22). The reliance is understandable, as there the Second Circuit held that a police officer was entitled to qualified immunity as a matter of law when he shot and killed a suspect as others were seeking to intervene in the arrest. *Id.* at 91-92. But, *Salim* is distinguishable. There, on "plaintiff's version" of the facts, the officer "was being pummelled by more than five people." *Id.* at 91. The officer shot the suspect "in the midst of a struggle when the possibility that [the suspect] might gain control of the officer's weapon was imminent." *Id.* at 91-92. Indeed, the officer shot the suspect "'instinctively' in reaction to seeing [the suspect's] hand on the barrel of his gun while the two were locked in a struggle." *Id.* at 91. In light of the jury's findings, no such facts existed here. The jury found that Connolly was not being choked and rejected his assertion that he was in fear for his life. (*See* Second Trial Tr. at 451; Doc. No. 140)

2.  **Loss of Enjoyment of Life**

Connolly argues that the jury's award of $2.5 million for Collado's loss of enjoyment of life must be set aside because such damages -- sometimes referred to as "hedonic damages"[15] -- are not recoverable in a § 1983 case. Connolly notes that loss of life damages are not permitted under the New York survival and wrongful death statutes, and that no Supreme Court or Second Circuit decision has allowed such a remedy in a § 1983 case. (Def. Mem. at 30 (citing N.Y. Est. Powers & Trusts Law §§ 5-4.3, 11-3.3)).[16]

---

[15]    "Hedonic damages value 'the loss of the enjoyment of life as affected by physical pain and suffering, physical disability, impairment and inconvenience affecting an individual's normal pursuits and pleasures of life.'" *Crawford v. Franklin Credit Mgmt. Corp.*, No. 08-CV-6293 (KMW), 2015 WL 13703301, at *8 (S.D.N.Y. Jan. 22, 2015) (citation omitted); *see generally* Victor E. Schwartz & Cary Silverman, *Hedonic Damages: The Rapidly Bubbling Cauldron*, 69 Brook. L. Rev. 1037, 1041-42 (2004).

[16]    Section 5-4.3 provides:

> The damages awarded to the plaintiff may be such sum as the [factfinder] . . . deems to be fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought. In every such action, in addition to any other lawful element of recoverable damages, the reasonable expenses of medical aid, nursing and attention incident to the injury causing death and the reasonable funeral expenses of the decedent paid by the distributes . . . shall also be proper elements of damage.

N.Y. Est. Powers & Trusts Law § 5-4.3(a).

Section 11-3.3 provides:

> Where an injury causes the death of a person the damages recoverable for such injury are limited to those accruing before

This issue arose at the first trial, as Connolly objected to the claim as a matter of law. (First Trial Tr. at 194-95, 394-95, 591). In the end, I decided that the issue would be put to the jury, and then, if the jury were to rule in Mrs. Collado's favor and award loss-of-life damages, we would consider the question further in post-trial motions. (*Id.* at 394, 591).

The claim presents two issues: (1) whether loss-of-life damages are recoverable in a § 1983 action as a matter of law, and, (2) if so, the amount of damages to be awarded for Collado's loss of his life. (*Id.* at 591).

### a. Recoverability

I hold that damages for the loss of enjoyment of life are recoverable in a § 1983 action.

While it is true that the Supreme Court and the Second Circuit have not squarely addressed the issue, the weight of authority supports the conclusion that loss-of-life damages are recoverable in a § 1983 case even when state law does not allow them.

---

death and shall not include damages for or by reason of death, except that the reasonable funeral expenses of the decedent, paid by the estate or for the payment of which the estate is responsible, shall be recoverable in such action. The damages recovered become part of the estate of the deceased.

N.Y. Est. Powers & Trusts Law § 11-3.3(a).

First, the Second Circuit's ruling in an analogous case strongly supports the conclusion that loss-of-life damages are recoverable in a § 1983 action. In *McFadden v. Sanchez*, where New York City police officers shot and killed a suspect as they were attempting to arrest him, the court held that even though punitive damages were not available under the New York survival statute, they were recoverable by the decedent's estate under § 1983. 710 F.2d 907, 910-11 (2d Cir. 1983) (citing N.Y. Est. Power & Trusts Law § 11-3.2 (McKinney 1967) (repealed 1982)). The court concluded that "limitations in a state survival statute have no application to a section 1983 suit brought to redress a denial of rights that caused the decedent's death." *Id.* at 911. The court considered 42 U.S.C. § 1988, which provides that when federal law does not offer "suitable remedies," "courts shall apply 'the common law, as modified and changed by the constitution and statutes of the State wherein the court' sits unless such state law is 'inconsistent' with federal law." *Id.* at 910 (quoting § 1988). The court held:

> To whatever extent section 1988 makes state law applicable
> to section 1983 actions, it does not require deference to a
> survival statute that would bar or limit the remedies
> available under section 1983 for unconstitutional conduct
> that cause death. State law that would preclude a claim for
> punitive damages in a case like the present one is manifestly
> "inconsistent" with federal law within the meaning of section
> 1988.

*Id.* at 911. While *McFadden* involved the recoverability of punitive damages in a § 1983 death case, the court's reasoning applies with equal force here.

Second, other courts have explicitly held that loss-of-life damages are recoverable by a decedent's estate where the unconstitutional conduct of government officials resulted in death. In *Bass ex rel. Lewis v. Wallenstein*, a prisoner died while in custody and his estate sued certain prison officials for damages alleging violations of his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right not to be deprived of life without due process of law. The jury found liability and awarded damages of $250,000 to the estate for the injuries suffered by the prisoner -- specifically his "pain and death." 769 F.2d 1173, 1176, 1187 (7th Cir. 1985). Under the Illinois survival statute, the prisoner's estate could recover for his "conscious pain and suffering," but not for his "loss of life," as Illinois law "effectively call[ed] for abatement of [the prisoner's] constitutional claim that defendants deprived him of his fourteenth amendment right to life." *Id*. at 1189. The court confirmed its precedent that "where the constitutional deprivation sought to be remedied has caused death, state law that precludes recovery on behalf of the victim's estate for the loss of life is inconsistent with the deterrent policy of section 1983." *Id*. at 1190 (internal quotation marks omitted).

Within this District, Judge Marrero has held, in a case similar to the present one, that the estate of an individual who was subjected to excessive force by NYPD officers and subsequently died from his injuries could recover loss-of-life damages. In *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239, 247 (S.D.N.Y. 2001), the

defendants argued that because damages for loss-of-life were not recoverable by a decedent's estate under New York law, they were not permitted in an action brought pursuant to § 1983. The court rejected the argument, concluding:

> [T]he Court finds that insofar as New York's survivorship of claims statute would bar recovery of the damages that the jury awarded for [the decedent's] loss of enjoyment of life, the state law fails to take into account policies analogous to the goals expressed in § 1983.

*Id.* at 252. I agree with the reasoning of Judge Marrero and the Seventh Circuit.

The goals of § 1983 referred to by Judge Marrero are two-fold: "compensating victims for suffered wrongs" and "deterring future deprivations of constitutional rights through compensatory and, where appropriate, punitive damages." *Id.* at 251 (citing *Robertson v. Wegmann*, 436 U.S. 584, 590-91 (1978); *Carey v. Piphus*, 435 U.S. 247, 254-57 (1978)). Moreover, as the Tenth Circuit has observed, "Congress intended significant recompense when a constitutional violation caused the death of a victim. The general legislative history of the 1871 act makes clear that death was among the civil rights violations that Congress intended to remedy." *Berry v. City of Muskogee*, 900 F.2d 1489, 1501 (10th Cir. 1990).[17] A holding that § 1983 does not allow

---

[17]     The Tenth Circuit identified an additional reason for not incorporating state survival statutes that limit remedies in death cases: "[I]f we were to define § 1983 remedies in terms of the state survival action, supplemented by the state wrongful death act, we place into the hands of the state the decision as to allocation of the recovery in a § 1983 case, and, indeed, whether there can be any recovery at all. . . . The laws are not suitable to carry out the full effects intended for § 1983 cases ending in death of the victim; they are deficient in some respects to

the recovery of loss-of-life damages where the unconstitutional conduct of a government official results in death would be inconsistent with the goals of the statute.

Accordingly, I hold that Mrs. Collado may recover loss-of-life damages on behalf of her husband.

### b. Amount

In his post-trial briefing, while Connolly attacks the recoverability of the loss-of-life damages as a legal matter, he does not separately challenge the amount of the jury's award for Collado's loss of life: $2.5 million. In any event, I conclude that the jury's award is reasonable.

Of course, it is difficult if not impossible to put a monetary value on the loss of a life or the loss of enjoyment of life. *See, e.g., Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244-46 (10th Cir. 2000) (affirming district court's decision to allow expert to testify as to "the meaning of hedonic damages" but not to "quantify hedonic damages"). The jury here was instructed in this respect as follows:

> Plaintiff may also recover damages, on behalf of Mr. Collado, in such sum as you find will fairly and justly compensate him for his loss of enjoyment of the life he would have lived. These damages are independent of, and may be in addition to, whatever damages may exist to compensate for the pain and suffering Mr. Collado experienced before he died.

---

punish the offenses. Application of state law, at least in some instances, will be inconsistent with the predominance of the federal interest." 900 F.2d at 1506.

Of course, it is difficult to put a value on the life of a human
being. You are to determine, as best you can, in light of all
the circumstances and the evidence presented, the value of
Mr. Collado's life had he lived.

(Second Trial Tr. at 425).

"[A] jury's award [may be set aside] only if it is so high as to shock the
judicial conscience and constitute a denial of justice." *Restivo v. Hessemann*, 846 F.3d 547,
587 (2d Cir. 2017) (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir.
2012)). While the record contains little if any evidence of the monetary value of
Collado's life, the sum of $2.5 million for the loss of life of a 43-year-old man is in my
view "realistic and reasonable," *see Renaldi v. New York, New Haven & Hartford R.R. Co.*,
230 F.2d 841, 845 (2d Cir. 1956) (arguing that life expectancy estimates "are not inflexible
rules which the jury must follow, but are guides to assist them in awarding realistic and
reasonable damages"), and does not shock my judicial conscience. As Mrs. Collado
points out in her brief (Pl. Mem. at 30 n.14), the wrongful conviction cases provide a
useful benchmark, *see, e.g., Restivo*, 846 F.3d at 588 (affirming award of $18 million for 18
years of incarceration); *Newton v. City of New York*, 171 F. Supp. 3d 156, 177 (S.D.N.Y.
2016) (approving remittitur totaling approximately $1 million per year for unjustified
incarceration). The jury's award of $2.5 million for loss-of-life damages will stand.

2. **Pecuniary Losses for Family Members**

The jury awarded compensatory damages of $1.5 million for monetary
losses sustained by his family: Mrs. Collado and Collado's six children. Connolly

argues that this award must be set aside because it is impermissibly speculative; he contends that Mrs. Collado "presented absolutely no evidence with respect to monetary losses incurred by several of [the] six children." (Def. Mem. at 34). While I agree that Mrs. Collado presented no evidence with respect to several of the children and little evidence of the monetary value of Collado's "services,"[18] the award of $1.5 million is reasonable even if we consider the pecuniary damages only to Mrs. Collado and the four younger children, who ranged in age from two to fifteen years old when their father was killed.

Courts recognize that pecuniary damages resulting from death usually lack direct evidence. *LaMarca v. United States*, 31 F. Supp. 2d 110, 130 (E.D.N.Y. 1998). Calculation of pecuniary losses is therefore left to the jury, which considers factors including "age, character, earning capacity, health, intelligence, and life expectancy of the decedent, as well as the degree of dependency of the distributees upon the decedent and the probable benefits they would have received but for the untimely death." *McKee*

---

[18] Mrs. Collado did present evidence of the support Collado provided to her and his family. She testified: "John was a provider. He was a special man who took care of everything and anything. He was on top of everything. If he had to do anything around the house, he would. If he had to cook, he would cook. If he had to do . . . the wash, he did. . . . He would do everything, or we would do it together, but he would take part in everything that had to be done at home." (Second Trial Tr. at 124-25). She also testified that "[h]e was the best father. He did everything for my son. He took him to school. He fed him. He bought him everything he needed. They were together all the time. As far as I see it, he was his first teacher, because he was able to teach him everything he could during those three years." (*Id.* at 126). Amy Collado, one of Collado's daughters, also testified that Collado "was a great father to me, to my siblings, to my entire life. As long as I can remember he was always an amazing dad. He provided everything for me. He motivated me to do the best that I can do in life and school. He was my superhero." (*Id.* at 289).

*v. Colt Elecs. Co.*, 849 F.2d 46, 52 (2d Cir. 1988) (citations omitted). Moreover, courts have held that testimony from the surviving spouse constitutes sufficient evidence to prove pecuniary damages. *Ramirez v. Chip Masters, Inc.*, 11-CV-5772 (WFK) (MDG), 2014 WL 1248043, at *11 (E.D.N.Y. Mar. 25, 2014) (finding such testimony "establishe[d] that the decedent played a role in providing the child with care, love and guidance").

New York law provides recovery in wrongful death actions for financial benefits as well as "for the loss of the nurture, care and guidance decedents would provide their children had death not intervened." *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 52 (2d Cir. 1984) (citing *Zaninovich v. American Airlines, Inc.*, 26 A.D.2d 155, 161 (1st Dep't 1996)). The amount awarded must equal the pecuniary value of the nurture, care, and guidance taken from the children. *McKee*, 849 F.2d at 50. In determining compensation, courts have considered the "loss of valuable services in the nature of instruction, training and guidance." *Red Star Towing & Transp. Co. v. The "Ming Giant,"* 552 F. Supp. 367, 377 (S.D.N.Y. 1982); *see also Barrett v. United States*, 660 F. Supp. 1291, 1321-22 (S.D.N.Y. 1987) (emphasizing the importance of the child's education as a significant source of guidance). The court also considers the age and number of decedent's children in determining the appropriate amount of damages. *See, e.g., Ramirez*, 11-CV-5772 (WFK) (MDG), 2014 WL 1248043, at *11 (awarding $1,000,000 in damages for loss of parental care and guidance of seven-month-old); *Carlson v. Porter*, 53 A.D.3d 1129, 1134 (4th Dep't 2008) (concluding that an award of $250,000 per child,

all three of whom were under 10 years old, for past loss of parental guidance and $750,000 per child for future loss of parental guidance would be reasonable compensation); *Snuszki v. Wright*, 34 A.D.3d 1235, 1235-36 (4th Dep't 2006) (affirming $1,000,000 for loss of parental guidance of two children).

Here, both Mrs. Collado and Collado's daughter Amy testified as to the impact of the loss of their husband and father, respectively, on their lives as well as on the lives of the younger children. The jury's award of $1.5 million is reasonable and will stand.

### 3.   Funeral and Burial Expenses

The jury awarded Mrs. Collado $25,000 for Collado's funeral and burial expenses. She concedes that this award should be reduced to $11,991.95, the total of the funeral and burial bills that were received into evidence. (Pl. Mem. at 21 n.11; PX 27; Second Trial Tr. at 27). Connolly's motion is granted to this extent.

### 4.   Punitive Damages

The jury awarded punitive damages of $10 million. This award is vacated, for I do not believe that punitive damages are warranted in the circumstances presented here.

There is no clear, objective standard that exists to justify the award of one amount, as opposed to another, to punish a tortfeasor for misconduct. *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013). "A jury may 'assess punitive damages in an action under

§ 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it invokes reckless or callous indifference to the federally protected rights of others.'" *DiSorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)); *accord McFadden*, 710 F.2d at 913 ("[P]unitive damages are available under section 1983 to advance the statute's purpose of securing the protection of constitutional rights. An award of punitive damages punishes a defendant who has acted intentionally or recklessly to deny a plaintiff his protected rights.").

Even construing the evidence in the light most favorable to Mrs. Collado, I do not believe, nor could a reasonable jury find, that Connolly acted with evil motive or intent or with reckless or callous indifference to Collado's federally protected rights. After struggling with a drug dealer to exhaustion, to a point where apparently he was "begging, 'Please, please, please'" (Second Trial Tr. at 101), Connolly suddenly found himself confronted by not just one but two individuals, both of whom were substantially bigger than him and both of whom were using force on him. Moreover, instead of pulling off Batista -- who was on top -- Collado started pulling Connolly, including, according to one witness, by the neck. (*Id.* at 331). Without knowing Collado's intentions, Connolly thus found himself in what objectively was a perilous situation.

Mrs. Collado's counsel told the jury in summation, referring to Connolly, that "we're not saying that he's a bad man, that he's an evil man, that he's this despicable

person. That's not what we're saying. He panicked." (*Id.* at 392). That may indeed be

what happened. But while panicking may be a basis for the finding of excessive force, it

is not a basis for the imposition of punitive damages. The jury's award of punitive

damages is hereby vacated.

## C.    Motion for New Trial

Connolly also moves for a new trial pursuant to Rule 59 of the Federal

Rules of Civil Procedure. The motion is denied.

A court may grant a motion for a new trial "for any reason for which a

new trial has heretofore been granted in an action at law in federal court, including if

the verdict is against the weight of the evidence." *Raedle*, 670 F.3d at 417 (quoting Fed.

R. Civ. P. 59(a)(1)(A)). "[A] decision is against the weight of the evidence . . . if and only

if the verdict is [1] seriously erroneous or [2] a miscarriage of justice." *Farrior v.*

*Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002). The Second Circuit has

instructed that "jury verdicts should be disturbed with great infrequency." *ING Glob. v.*

*United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014). While trial judges

do have the ability to weigh credibility on a Rule 59 motion, they must do so "with

caution and great restraint, as a judge should rarely disturb a jury's evaluation of a

witness's credibility and may not freely substitute his or her assessment of the

credibility of witnesses for that of the jury simply because the judge disagrees with the

jury." *Raedle*, 670 F.3d at 418 (internal quotation marks and citations omitted).

This was an exceedingly close case. The first trial ended in a mistrial, as the jury was unable to reach a unanimous verdict, and I may very well disagree with the second jury's assessment of the credibility of at least some of the witnesses. But "when, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case." *ING Glob.*, 757 F.3d at 99. This was not an egregious case, except with respect to the $10 million award of punitive damages, which I have now set aside. The jury did not accept Connolly's testimony that he was being choked to the point where he was in fear of losing his life; this was purely a credibility determination, one that I decline to second-guess.

The motion for a new trial is denied.

## CONCLUSION

For the reasons set forth above, Connolly's motion for judgment as a matter of law is GRANTED in part and DENIED in part. The award of $25,000 for funeral and burial expenses is reduced to $11,991.95 and the award of $10 million in punitive damages is vacated. Connolly's motions for a new trial and remittitur are DENIED. Judgment will be entered in favor of Mrs. Collado against Connolly and the City in the amount of $4,311,991.95. Counsel for Mrs. Collado shall submit a proposed judgment on notice within ten days hereof.

The parties shall discuss the issue of attorneys' fees and costs. If they are unable to agree on an appropriate award of attorneys' fees and costs, Mrs. Collado shall move for attorneys' fees and costs within thirty days hereof; Connolly and the City shall oppose the motion within fourteen days thereafter; and Mrs. Collado shall submit reply papers within seven days thereafter.

SO ORDERED.

Dated:     New York, New York
           August 23, 2019

DENNY CHIN
United States Circuit Judge
Sitting by Designation